## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JANE DOE,** | : | **No. 3:23cv1066** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **CRYSTAL RIVERA and MONROE** | : | |
| **COUNTY,** | : | |
| **Defendants** | : | |

················································································

### MEMORANDUM

A written custody order provided Plaintiff Jane Doe with primary physical custody of her three minor children.  During an investigation by Defendant Monroe County's Children and Youth Services Department ("CYS") into allegations of child abuse, Doe lost custody of two of those children pursuant to a CYS supervisor's phone call with a judge.  In this action, Doe asserts that the county and the supervisor, Defendant Crystal Rivera, violated her Constitutional rights during the investigation by forcing a switch in custody to her ex-husband without due process of law.

Before the court are cross-filed motions for summary judgment.  Doe asserts that partial summary judgment should be entered in her favor on the defendants' liability under 42 U.S.C. § 1983 ("Section 1983").  Defendants take a different view in support of their own motion for summary judgment.  According to their motion, Defendant Rivera facilitated a transfer of physical custody to Doe's

ex-husband through customary county practices.  Per defendants, the custody transfer occurred at the direction of an on-call judge, who issued a verbal order based on what Rivera stated on the phone.  Defendants assert that Rivera is immune from liability in her role at CYS under binding Third Circuit precedent and that no viable municipal liability claim exists against Monroe County.

For the reasons set forth below, immunity shields the child welfare worker, but the county takes the hit.  Defendants' motion for summary judgment will be granted in part.  Defendant Rivera enjoys absolute quasi-judicial immunity from Doe's Section 1983 claim.  The motion will be denied with respect to the Section 1983 claim against Defendant Monroe County.  Plaintiff's motion for partial summary judgment will be granted as to Defendant Monroe County's liability based on the undisputed facts and B.S. v. Somerset Cnty., 704 F.3d 250 (3d Cir. 2013).

**Background**

Serious allegations were levied against Doe in the summer of 2021. Specifically, Monroe County CYS was investigating allegations that Doe's oldest male child sexually assaulted Doe's youngest female child and that Doe attempted to cover it up.  These child abuse allegations were levied as Doe was engaged in ongoing domestic relations litigation with her ex-husband—in divorce, in custody, and in support. (Doc. 74-1, Doe Decl. 1, ¶¶ 5–9).

### 1. The Child Custody Order and ChildLine Report

At the time of the CYS investigation into sibling sexual abuse, an interim child custody order was in place in the associated civil action filed in the Monroe County Court of Common Pleas. (Doc. 74-4, 11/16/2020 Custody Order). Pursuant to the order, Doe enjoyed primary physical custody of her three children. Id. They will be referred to as Older Son, Younger Son, and Daughter in this memorandum. [1] Under that order, Husband enjoyed partial physical custody every other weekend. Doe and Husband shared legal custody of the three children.

Per Doe, the relationship between Older Son and Husband had become so antagonistic by June 2021 that there was family violence. Specifically, according to Doe, Husband pinned Older Son to the ground during a physical altercation. (Doe Decl. 1, ¶¶ 10–11).

---

[1] The parties used the same or similar pseudonyms for the children. Older Son and Younger Son are the biological children of Doe's first husband. (Doc. 74-1, Doe. Decl. 1, ¶ 2). Daughter is the biological child of plaintiff's second husband. Id., ¶ 3. Doe's second husband adopted Older Son and Younger Son. (Doc. 25, Am. Compl. ¶ 11). Doe and her second husband separated in 2018, began their family court litigation in 2019, and were divorced on May 4, 2020. Id., ¶ 12–15. From the court's review of the record, plaintiff's first husband was not involved in the relevant underlying state court proceedings. Therefore, for ease of addressing the issues, the court will refer only to plaintiff's second husband in the body of this memorandum and use "Husband" as a pseudonym.

A report was made to ChildLine regarding the children on June 10, 2021.[2]

(Doc. 74, Pl. SOF ¶ 18).[3]  On about June 18, 2021, a Monroe County CYS

caseworker called Doe to tell her the agency was conducting a welfare check. Id.

¶ 19.  The caseworker made several attempts to see Doe and the children after

the ChildLine complaint was filed, but Doe was not home during several of those

attempts to make contact.  Id.

Doe later agreed to meet at the agency office and then later at the

Children's Advocacy Center ("CAC").[4] Id.  By text message, Defendant Rivera,

---

[2] ChildLine is a toll-free hotline, part of a mandated statewide child protective services program designed to accept child abuse referrals and general child well-being concerns and transmit the information quickly to the appropriate investigating agency.  See 23 PA. CONS. STAT. § 6332.  Earlier in this litigation, Doe attempted to obtain the identity of the individual who made the ChildLine report on June 10, 2021, ostensibly to demonstrate that it was Husband or his proxy. (Doc. 38).  After reviewing the parties' letter briefs on the issues and conducting an in camera review, United States Magistrate Judge Susan E. Schwab denied Doe's request. (Doc. 51). This matter was reassigned after the cross-filed motions for summary judgment were ripe for disposition.

[3] The court refers to the parties' statements of fact (i.e, "Pl. SOF" or "Def. SOF") for undisputed facts or facts which the opposing party admitted in their responses to the statements of fact.

[4] A "children's advocacy center" is defined under Pennsylvania's Child Protective Service Law ("CPSL") as:

> A local public agency…which…operates within this Commonwealth for the primary purpose of providing a child-focused, facility-based program dedicated to coordinating a formalized multidisciplinary response to suspected child abuse that, at a minimum…assists county agencies, investigative teams and law enforcement by providing services, including forensic interviews, medical evaluations, therapeutic interventions, victim support and advocacy, team case reviews and a system for case tracking.

23 PA. CONS. STAT. § 6303(a).

the casework supervisor, advised Doe that she had an appointment on June 30, 2021, and that she should bring all the children. Id. ¶ 20.

The CAC interviews were not scheduled to investigate allegations of Husband's physical abuse of Older Son that Doe mentioned in her summary judgment declaration. Rather, according to Defendant Rivera's summary judgment affidavit, the ChildLine report provided to CYS contained allegations that Older Son, then approximately 14 years of age, had sexual contact with Daughter, who was then 7 years old. (Doc. 74-6, Emerg. Pet. for Custody, ¶ 3; Doc. 71, Def. Ex. A., C. Rivera Aff., ¶ 1).

### 2. Defendant Rivera Believed that Younger Son and Daughter Implicated Older Son in Sexual Abuse and that Doe Engaged in Cover-up Efforts

As part of the CYS investigation, Plaintiff brought Older Son, Younger Son, and Daughter to the CAC in East Stroudsburg, Pennsylvania on June 30, 2021. (C. Rivera Aff., ¶ 4). A former Pennsylvania State Police Trooper, Lynn Courtright, conducted forensic interviews of Younger Son and Daughter. Id. ¶ 6.

Defendant Rivera watched the forensic interviews on closed-circuit television. Id. ¶ 9. According to Rivera's impressions from the interview, Daughter told Courtright that Older Son penetrated her body and that it felt "bad." Id. ¶ 10. Daughter described the contact with her genitals in a drawing. Id. Younger Son told Courtright in a separate interview that Older Son admitted to having sexual contact with Daughter. Id. ¶ 11. Per Rivera, Younger Son also told

5

Courtright that Older Son inappropriately touched their cousin, a baby. Id. Younger Son further stated that their mother, the Doe plaintiff, knew of Daughter's claim but told Younger Son that the accusation was a lie. Id. ¶ 12. Younger Son also relayed that his mother instructed him to keep everything a secret.[5] Id. ¶ 12.

Because of her impressions from the interviews, Rivera had concerns regarding the safety of Daughter and Younger Son in Doe's care. Id. ¶¶ 14–15. Nonetheless, CYS did not take protective custody of Younger Son or Daughter under Pennsylvania's Child Protective Service Law ("CPSL") or seek shelter care placement under the state Juvenile Act. Id. ¶ 26.

### 3. Doe Challenges Rivera's Concerns; Rivera Contacts Husband

Redacted copies of Rivera's case notes were provided to Doe in discovery. Rivera's note from June 30, 2021 provides, in relevant part:

> [I] met with [Doe] after the interview and stated there are concerns about [Younger Son] and [Daughter] remaining in her care.  [Doe] was irate and stated this is all caused by [Husband] and his lies.  [Doe] stated that [Husband] tries to brainwash the [children].
>
> [I] explained to [Doe] it is an investigation and explained to [Doe] her rights and how she is currently an [alleged perpetrator].  [Doe] began to yell at [me] and stated she

---

[5] Defendants provided the videos of the forensic interviews in support of their motion for summary judgment.  Although reviewed, Defendant Rivera's impressions from those interviews and her conduct following the interviews are what matter here, not whether her impressions are reasonable or unreasonable.

was going to contact her attorney. [Doe] tried calling the attorney and they were not answering.

*([I] contacted [Husband] while [Doe] was calling her attorney and explained the situation. [Husband] stated he is willing to keep the [children] if [Doe] is agreeable to breaking the custody order because he only gets weekends. [I] advised [Husband] to come to the CAC. [Husband] stated he was on his way).*

[REDACTED]

[Doe] began to say to [me] Trooper Kriedler already interviewed the [children] about this and they all denied it. [Doe] stated why [am I] saying otherwise. [I] stated to [Doe] [I am] not going to get into details because it is an investigation, but there are current concerns. [Doe] then stated she did not want to allow [Husband] to take the [children].

[I] explained having to call a judge for permission to violate the order because [Husband] is willing to take the [children] pending the investigation. [Doe] refused.

[REDACTED]

[I] asked [District Attorney Curtis] Rogers to call for [law enforcement] assistance, which DA Rogers stated he already did.

(Doc. 74-5, 06/20/2021 CYS Contact Summary) (formatting modified and emphasis added).[6]

---

[6] The court puts emphasis on the portion of Rivera's case note that is placed within parenthesis because it appears to be written like an explanatory aside.

7

To condense this case note, after being told by Defendant Rivera that she was an alleged perpetrator of child abuse after the forensic interviews, Doe contested those facts before Rivera and did not agree that Younger Son and Daughter could go to Husband.[7] Id.; see also Doe Decl. 1, ¶ 16.  According to Doe, Rivera told her after the interview that if plaintiff did not agree to violate the custody order, Rivera would place Younger Son and Daughter in foster care. (Doc. 81-1, Doe Decl. 2, ¶ 5).

### 4. Rivera Contacts an On-Call Judge

According to Defendant Rivera, she decided to call the Monroe County Control Center to speak with an on-call judge. (C. Rivera Aff., ¶ 16).  The control center placed her in contact with the Honorable C. Daniel Higgins, Jr., a judge of the Monroe County Court of Common Pleas. Id. ¶ 17.  Per the affidavit, Rivera relayed to Judge Higgins what Younger Son and Daughter said in their interviews. Id. ¶ 18.  In this account, Judge Higgins instructed Rivera to have Husband take Younger Son and Daughter to his home. Id. ¶ 20. Judge Higgins

---

[7] Doe continues to challenge any CYS safety concerns at that time.  She avers in this action, "On June 10, 2021, when the alleged incident between my older son and daughter took place, my older son was staying with [his maternal grandparents]." (Doc. 81-1, Doe Decl. 2, ¶ 5).  Doe also believes that Defendant Rivera had personal animus toward her.  Specifically, Doe avers that "on or about July 23, 2021, Ms. Rivera made it known to me that she would do whatever she could to make sure my daughter and younger son remained out of my custody." Id. ¶ 8. However, Doe is not asserting a due process claim based on an argument that there was no objectively reasonable suspicion of abuse.  These facts are not relevant to the cross-filed motions for summary judgment.

also told Rivera, according to her affidavit, to tell Husband to have his attorney

file a petition to modify the existing custody order. Id. ¶ 21.

Defendant Rivera indicated that she obeyed Judge Higgins's order by

calling Husband to pick up Younger Son and Daughter. Id. ¶ 22.  Per Rivera, she

"only facilitated the transfer of physical custody to the father, who already had

legal custody, and at the specific direction of the court." Id. ¶ 27.

Furthermore, Rivera's notes indicate:

> [I] contacted control center and requested to speak to an
> on-call judge. [I] spoke to Judge Dan Higgins and
> explained the situation. Judge Higgins stated [Husband] is
> a fit and willing parent and if [Doe] is not going to agree to
> violating the order, then he will allow [Husband] to keep
> [Daughter] and [Younger Son] against the custody order.
> The Judge advised for [Husband] to have his attorney file
> a modification [as soon as possible].  [I] thanked Judge
> Higgins…[REDACTED]…
>
> [Daughter] was crying and would not speak to [me].

(Doc. 74-5, 06/20/2021 CYS Contact Summary).

### 5.  Doe's Physical Custody Rights Were Impacted

As indicated above, CYS never took protective custody of Older Son,

Younger Son, or Daughter or filed a dependency-related petition.  Rather, the

record reflects that Doe and Husband litigated their respective child custody

rights in the civil action.  CYS was not a party to the custody proceedings

between Doe and Husband. (Doc. 74, Pl. SOF, ¶ 33).

9

On a more granular level, it is undisputed in this case that no formal hearing took place in the Monroe County Court of Common Pleas regarding the transfer of custody on June 30, 2021, whether in dependency court or custody court. (Doc. 74, Pl. SOF ¶ 54). There is no written court order memorializing the change in physical custody on that date after the CAC interviews. To the extent that Rivera asserts that she was acting pursuant to a court order, Doe contends that Judge Higgins did not issue any custody order for more than a week and not until after Husband filed petitions in the custody actions.

Specifically, on July 2, 2021, two days after the CAC interviews, Husband filed an emergency petition for custody seeking sole physical and legal custody of Younger Son and Daughter pending a hearing. (Doc. 74-6). Husband, through counsel, also filed a petition for modification of custody seeking primary physical custody of Younger Son and Daughter. (Doc. 71, Def. Ex. E, ECF pp. 45–49).

The court did not issue an order right away. On July 7, 2021, or seven (7) days after the ostensible phone call with Defendant Rivera, Judge Higgins entered a temporary custody order providing Husband with sole physical custody of Younger Son and Daughter. Id., Def. Ex. F., ECF pp. 50–52. Nonetheless, the order set a conciliation conference with a custody master, not a hearing on the petition. Id.

According to Doe, no hearing on the petitions occurred until April 5, 2022. (Doc. 81, Pl. RSOF ¶ 37).  The events between July 2021 and April 2022 in the underlying custody action are not clear from the summary judgment record.[8]  In the interim, Doe and Older Son were indicated for child abuse by CYS under the CPSL; however, those findings were reversed in July 2022 after an administrative appeal and hearing in April 2022.[9]

Approximately 18 months after the CAC interviews, on December 15, 2022, Doe and Husband agreed to a custody stipulation where Doe and Husband would share legal and physical custody (50/50) of Younger Son and Daughter. (Doc. 74-8).  Pursuant to the stipulation, Doe would enjoy sole legal and physical custody of Older Son. Id.  The record does not reflect any changes to the custody order since that time.

---

[8] From portions of the record (supplied by Doe), Defendant Rivera prepared to participate in custody hearings in July 2021 and in September 2021. (Doc. 81-3, 07/15/2021 CYS Contact Summary; Doc. 81-4, CYS Contact Summary).  Fair inferences may thus be drawn that the hearings were continued several times.  The moving party behind those continuances is unknown to the court.

[9] The Agency continued with a child protective services investigation. (Doc. 81-2, C. Rivera Dep. Vol I, 47:3-8).  Defendant Rivera interviewed Doe and Older Son. Id., C. Rivera Dep. Vol II, 8:3–10:12).  At the conclusion of the investigation, Doe and Older Son were indicated for child abuse. (Doc. 81-6, Commw. DHS BHA Adjudication, ECF p. 3, ¶ 10).  Doe filed an administrative appeal under 23 PA. CONS. STAT. § 6341.  A decision indicates that the appeal was sustained, or, in essence, the indicated statuses for Doe and Older Son were reversed. Id., ECF pp. 13–15.  The indicated reports have thus been expunged under Pennsylvania law.

### 6. Doe Asserts that Monroe County and Rivera Violated Her Constitutional Right to Procedural Due Process

On June 26, 2023, Doe filed this civil rights lawsuit against Monroe County and Monroe County CYS Supervisor Crystal Rivera pursuant to Section 1983 for violation of her Fourteenth Amendment right to procedural due process. (Doc. 1, Compl.).  In the operative amended complaint, Doe alleges that defendants violated the Constitution by removing two children from her physical custody and shifting custody to Husband without a hearing.   (Doc. 25, Am. Compl., ¶ 57). Doe also contends that Defendant Rivera's ex parte communication with Judge Higgins on June 30, 2021 violated her right to due process. Id. ¶ 59.

According to Monroe County's answers to interrogatories in this case, it is CYS's practice "that if there is a willing and able parent who can take custody of a child, but there is a custody order that disqualified that parent from taking custody, the agency is to contact the court for approval to override that custody order. (Doc. 74, Pl. SOF, ¶ 52) (emphasis removed).  Monroe County has also admitted here that CYS "does not typically have a parent present on a phone call to the court regarding removing/moving" children, which "is an agency practice and not exclusive to [this] case." Id. ¶ 53.

Those admissions warrant an order granting summary judgment in favor of Doe on the liability portion of her procedural due process claim against Defendant Monroe County.  As for Defendant Rivera, however, she enjoys

absolute quasi-judicial immunity as a child welfare worker.  This mixed ruling is explained below.

**Jurisdiction**

As a preliminary matter, however, defendants challenge the court's jurisdiction in their motion for summary judgment.  Specifically, they assert that Doe's lawsuit runs afoul of the Rooker–Feldman doctrine.[10] (Doc. 72 at 14). Under the Rooker-Feldman doctrine, district courts lack subject matter jurisdiction over claims that are, in substance, appeals from state court judgments. Rooker v. Fidelity Trust Co., 263 U.S. 413, 416 (1923); District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 482 (1983).   Per the defendants, Judge Higgins's verbal order was a state court judgment regarding custody, which prevents the court from considering Doe's procedural due process claim.

"The Rooker–Feldman doctrine prevents the lower federal courts from exercising jurisdiction over cases brought by 'state-court losers' challenging 'state-court judgments rendered before the district court proceedings commenced.' " Lance v. Dennis, 546 U.S. 459, 460 (2006) (quoting Exxon Mobil

---

[10] Although named after two Supreme Court decisions, Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923) and District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983), this doctrine is derived from 28 U.S.C. § 1257, which vests the authority to review state court judgments solely with the United States Supreme Court. Vuyanich v. Smithton Borough, 5 F.4th 379, 384 (3d Cir. 2021) (citing (quotation marks and brackets omitted)).

Corp. v. Saudi Basic Industries Corp., 544 U.S. 280, 284 (2005))  The doctrine

occupies narrow ground and applies only in limited circumstances. Exxon Mobil

Corp., 544 U.S. at 284, 291.

Four conditions must be met for the Rooker–Feldman doctrine to apply: "(1)

the federal plaintiff lost in state court; (2) the plaintiff 'complain[s] of injuries

caused by [the] state-court judgments'; (3) those judgments were rendered

before the federal suit was filed; and (4) the plaintiff is inviting the district court to

review and reject the state judgments."  Great W. Mining & Min. Co. v. Fox

Rothschild LLP, 615 F.3d 159, 166 (3d Cir. 2010) (quoting Exxon Mobil Corp.,

544 U.S. at 284).  When all four requirements are satisfied, a claim must be

dismissed for lack of subject matter jurisdiction. See Merritts v. Richards, 62

F.4th 764, 774 (3d Cir. 2023) (citations omitted).

Upon review of the Rooker–Feldman requirements, the court agrees with

Doe that the doctrine does not apply here.  Under the second requirement—

injury caused by the state court judgment—the court looks to the source of the

plaintiff's injury. Great Western Mining & Mineral Co., 615 F.3d at 166 (citation

omitted).  If the source of the plaintiff's injury is the state-court judgment itself, the

Rooker–Feldman doctrine applies. Id. If, however, the source of the plaintiff's

injury is the defendant's conduct that preceded the state-court judgment, the

doctrine does not bar federal jurisdiction, even if the state court adjudicated the same issue. Id. at 167.

Doe has evidence that her injury arises from Rivera's actions as opposed to any orders issued by the court. Doe is also challenging county policies of shifting custody without a hearing. The second Rooker-Feldman requirement is thus not met.

Furthermore, Doe is not requesting the court to review and reject the state judgment or a custody order—the fourth Rooker-Feldman requirement. Rather, she requests damages for procedural due process violations by the county and its child welfare agency supervisor.

"Rooker-Feldman is a limited doctrine that must not be applied outside of a precise, narrow set of circumstances." Vuyanich, 5 F.4th at 390. It does not apply where a parent challenges the conduct of child welfare workers that led to state court custody orders or when a parent challenges underlying government policies allegedly stripping parents of custody without a hearing. B.S. v. Somerset Cnty., 704 F.3d 250, 259–60 (3d Cir. 2013); Allen v. DeBello, 861 F.3d 433, 439 (3d Cir. 2017); Hatfield v. Berube, 714 F. App'x 99, 103 (3d Cir. 2017) (non-precedential). Therefore, Doe has satisfied the court that it has jurisdiction to consider her procedural due process claims against Monroe County and Rivera. Because those claims arise out of enforcement of the

Fourteenth Amendment thorough Section 1983, the court has federal question jurisdiction under 28 U.S.C. § 1331.

**Standard of Review**

Additionally, this matter comes before the court on cross-filed motions for summary judgment.  Summary judgment is proper when there is no genuine issue of material fact in the case and the moving party is entitled to judgment as a matter of law.  Reedy v. Evanson, 615 F.3d 197, 210 (3d Cir. 2010) (citation omitted); see also FED. R. CIV. P. 56(a).  "A fact is material if its resolution 'might affect the outcome of the suit under the governing law,'…[a]nd a dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " Mall Chevrolet, Inc. v. Gen. Motors LLC, 99 F.4th 622, 631 (3d Cir. 2024) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

At this stage, the judge's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.  All "facts in dispute," Daniels, 776 F.3d at 187, and all "inferences to be drawn from the underlying facts must be viewed in the light most favorable to the opposing party," Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (cleaned up).  "[W]hen there is a disagreement about the facts or the proper inferences to be drawn from

16

them, a trial is required to resolve the conflicting versions of the parties."

Peterson v. Lehigh Valley Dist. Council, United Bhd. of Carpenters & Joiners,

676 F.2d 81, 84 (3d Cir. 1982).  Furthermore, "a court's role remains

circumscribed in that it is inappropriate for a court to resolve factual disputes and

to make credibility determinations." Big Apple BMW, Inc. v. BMW of N. Am., Inc.,

974 F.2d 1358, 1363 (3d Cir. 1992) (citation omitted).  "[W]here the non-moving

party's evidence contradicts the movant's, then the non-movant's must be taken

as true." Id. (citations omitted).

A motion for summary judgment may also be granted where a moving party

demonstrates that the nonmoving party "has not made 'a showing sufficient to

establish the existence of an element essential to that party's case ... on which

that party will bear the burden of proof at trial.' " Mall Chevrolet, Inc., 99 F.4th at

630 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 332 (1986) (emphasis

removed)).  After a moving party carries their burden to show the absence of a

genuine, material factual dispute, Rule 56 flips the burden onto "the nonmovant

to 'go beyond the pleadings and by [its] own affidavits, or by the depositions,

answers to interrogatories, and admissions on file, designate specific facts

showing that there is a genuine issue for trial.' " Daubert v. NRA Grp., LLC, 861

F.3d 382, 391 (3d Cir. 2017) (quoting Celotex Corp., 477 U.S. at 324).  The non-

moving party must "do more than 'simply show that there is some metaphysical

17

doubt as to the material facts." Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

"When both parties move for summary judgment, the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." Auto-Owners Ins. Co. v. Stevens & Ricci Inc., 835 F.3d 388, 402 (3d Cir. 2016) (cleaned up).  The Rule 56 standard does not change in the context of cross-filed motions. See id. (quoting Appelmans v. City of Philadelphia, 826 F.2d 214, 216 (3d Cir. 1987)); see also Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968) (holding that despite the "inherently contradictory claims" presented by parties each arguing they are entitled to summary judgment, if any genuine issues of material fact exist, they "must be disposed of by a plenary trial and not on summary judgment.").

**Analysis**

In this action, Doe asserts claims against Monroe County and Rivera under Section 1983 for violation of her Fourteenth Amendment procedural due process rights.  Defendants' motion for summary judgment raises immunity arguments, that is, whether Defendant Rivera is entitled to absolute immunity or qualified

immunity.[11]  The Supreme Court has "repeatedly...stressed the importance of resolving immunity questions at the earliest possible stage in litigation." <u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991) (per curiam).  Therefore, the court begins with a discussion of whether Rivera is immune from suit.

### 1. Whether Rivera is Entitled to Absolute Quasi-Judicial Immunity in Her Actions as a Child Welfare Worker

Defendants first argue that Rivera is entitled to absolute quasi-judicial immunity for seeking guidance from Judge Higgins following the CAC interviews of Daughter and Younger Son.[12]  (Doc. 72 at 9–10).  In the Third Circuit Court of

---

[11] Defendant Rivera's state statutory immunity under the CPSL, 23 PA. CONS. STAT. § 6318, is inapplicable in this matter because it involves Doe's federal civil rights. <u>Good v. Dauphin Cnty. Soc. Servs. for Child. & Youth</u>, 891 F.2d 1087, 1091 (3d Cir. 1989).  As mandated reporters under Pennsylvania law, county child welfare workers are not immunized from criminal liability by Section 6318(b) "for disregarding their statutory obligation to report suspected child abuse" in violation of 23 PA. CONS. STAT. §  6319. <u>Commonwealth v. Coyne</u>, 345 A.3d 306, 321 (Pa. Super. Ct. 2025).

[12] Section 1983 did not abolish longstanding common-law immunities from civil suits, such as absolute judicial immunity. <u>See</u> <u>Stump v. Sparkman</u>, 435 U.S. 349, 359 (1978) (discussing judicial immunity).  Absolute quasi-judicial immunity derives from absolute judicial immunity. <u>See</u> <u>Imbler v. Pachtman</u>, 424 U.S. 409, 418 (1976) (extending absolute judicial immunity to prosecutors acting as advocates).

Rivera is a child welfare worker.  Where a government official occupies a position that did not exist at common law, that official may still be entitled to absolute immunity if he or she performs functions analogous to those performed by officials who were immune at common law. <u>Butz v. Economou</u>, 438 U.S. 478, 514 (1978).  Put another way, certain state officials are entitled to absolute immunity from civil liability under the law to ensure the integrity of the judicial process, including other officials whose functions are comparable to a judge. <u>Id.</u> at 508 (citing <u>Bradley v. Fisher</u>, 13 Wall. 335, 20 L.Ed. 646 (1872)).

Courts apply a "functional approach" to immunity questions, examining the nature of the functions with which a particular official has been entrusted rather than the identity of the actor who performed them. <u>Forrester v. White</u>, 484 U.S. 219, 224 (1988).  For example, in <u>Ernst v.</u>

19

Appeals, child welfare workers like Defendant Rivera "are entitled to absolute immunity for their actions on behalf of the state in preparing for, initiating, and prosecuting dependency proceedings[,]" which extends to, "the formulation and presentation of recommendations to the court in the course of such proceedings." Ernst v. Child & Youth Servs. of Chester Cnty., 108 F.3d 486, 495 (3d Cir. 1997).

Absolute immunity extends whenever a child welfare worker formulates and presents recommendations to the court, even if those recommendations are made outside the context of a dependency proceeding. B.S., 704 F.3d at 265. Moreover, "the absence of dependency proceedings is not, in itself, a basis for resolving the absolute immunity question[.]" Id.

---

Child & Youth Servs. of Chester Cnty., 108 F.3d 486 (3d Cir. 1997), the court reasoned that the functions of child welfare workers in dependency proceedings are closely analogous "to a prosecutor's preparation for and initiation and presentation of a criminal prosecution," which entitles them to absolute immunity. Id. at 496–97. The extension of absolute immunity to child welfare workers was provided in Ernst because:

> (1) the functions performed by the CYS defendants in dependency proceedings are closely analogous to the functions performed by prosecutors in criminal proceedings; (2) the public policy considerations that countenance immunity for prosecutors are applicable to child welfare workers performing these functions; and (3) dependency proceedings incorporate important safeguards that protect citizens from unconstitutional actions by child welfare workers.

108 F.3d at 495.

Thus, in evaluating the functions of Defendant Rivera's role as a CYS supervisor, the court looks to cases involving prosecutorial immunity for their persuasive value.

At the same time, "administrative or investigatory actions" by child welfare workers are not protected by absolute immunity.  B.S., 704 F.3d at 265 (citing Ernst, 108 F.3d at 495, 497 n. 7) (further citation omitted); see also Odd v. Malone, 538 F.3d 202, 208 (3d Cir. 2008) (absolute immunity "attaches to actions intimately associated with the judicial phases of litigation, but not to administrative or investigatory actions unrelated to initiating and conducting judicial proceedings.") (cleaned up).  Consequently, child welfare workers enjoy absolute immunity for some functions and qualified immunity for others. See Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993) ("qualified immunity represents the norm") (cleaned up); see also Hatfield, 714 F. App'x at 104 (evaluating child welfare workers' absolute immunity for some conduct and qualified immunity for other conduct); Odd, 538 F.3d at 207–08 ("we begin with the presumption that qualified rather than absolute immunity is appropriate").

Absolute immunity is "strong medicine." B.S., 704 F.3d at 261.  "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." Burns v. Reed, 500 U.S. 478, 486 (1991).  Because the court reviews whether Rivera is absolutely immune from suit on a motion for summary judgment, the facts are considered in a light most favorable to Doe as the non-moving party. Giuffre v. Bissell, 31 F.3d 1241,

1253 (3d Cir. 1994); <u>Banks v. Mozingo</u>, 423 F. App'x 123, 126 (3d Cir. 2011) (non-precedential).

The line between investigative casework and prosecutorial casework is hazy.  <u>See</u> <u>B.S.</u>, 704 F.3d at 267.  In this case, Defendant Rivera testified clearly in one aspect.  She never took protective custody of the children. (Doc. 71, Def. Ex. C., C. Rivera Dep. Vol. I, 17:4-5).  As she explained in her deposition, she followed a different procedure:

> This is just a practice we have at our office.  We have – when we identify a safety threat and the children – we find that the children are going to be unsafe with a particular parent, in this situation there was a custody order.  We cannot break the custody order.  But because the parent did not want to forego her time with her children, I have to contact the judge to ask if these children can go with the other parent against a custody order.

<u>Id.</u> 17:6-23.

Furthermore, defendants have admitted that it is Monroe County CYS's practice "that if there is a willing and able parent who can take custody of a child, but there is a custody order that disqualified that parent from taking custody, the agency is to contact the court for approval to override that custody order. (Pl. SOF. ¶ 52) (emphasis removed).   With such testimony and the county's admissions in mind, the court performs a "meticulous" analysis of Rivera's actions and functions in this case. <u>Light v. Haws</u>, 472 F.3d 74, 79 (3d Cir. 2007).

In doing so, "[t]he court must ascertain just what conduct forms the basis for the plaintiff's cause of action, and it must then determine what function (prosecutorial, administrative, investigative, or something else entirely) that act served." Schneyder v. Smith, 653 F.3d 313, 332 (3d Cir. 2011).  Doe's amended complaint focuses on Rivera's ex parte conversation with Judge Higgins and the lack of a hearing prior to the shift in physical custody of Daughter and Younger Son to Husband. (Doc. 25, ¶¶ 56–60).  The court, however, looks at the broader context of Defendant Rivera's casework.

### a. Observing the CAC Interviews and Formulating a Plan for Daughter and Younger Son's Custody

First, Rivera, as part of her duties at CYS, addressed the ChildLine referral regarding the Doe family as a general protective services ("GPS") case under the CPSL.[13] (Doc. 72, Def. Ex. C. C. Rivera Dep., Vol. I, 31:17-22).

Under state regulations, 55 PA. CODE §§ 3490.201–3490.242, GPS cases are to provide "services to prevent the potential for harm to a child" who meets certain broad criteria. 55 PA. CODE § 3490.223.  The purpose of GPS

---

[13] "Protective services" are "services and activities provided by…each county agency for children who are abused or are alleged to be in need of protection" under the CPSL. 63 PA. CONS. STAT. §  6303(a).

involvement is to protect the safety of children and to assist parents in recognizing and remedying harmful conditions, 55 PA. CODE § 3490.222.[14]

Once received, referrals of GPS cases require an "assessment" to be completed within 60 days. 55 PA. CODE § 3490.232(e). Additionally, the county agency must interview the children subject to the report (if age appropriate), as well as the primary person who is responsible for the care of the child. 55 PA. CODE § 3490.232(g). As authorized by Pennsylvania law, a CAC assists a county CYS agency as part of a "formalized multidisciplinary response to suspected child abuse" by providing services, including forensic interviews of children. 23 PA. CONS. STAT. § 6303(a).

Based on the above regulatory structure, Rivera was conducting a safety assessment when the forensic interviews began. However, it is uncontroverted in this case that, as Rivera observed those interviews, she determined that Doe was an alleged perpetrator of child abuse, and that Younger Son and Daughter would not be safe in her custody. By state regulations, that triggered the implication and application of child protective services ("CPS") regulations applicable to county agencies, 55 PA. CODE §§ 3490.51–3490.73.

---

[14] CYS caseworkers are governed by extensive state regulations regarding protective services. 55 PA. CODE §§ 3490.1–3490.401.

Thus, under this structure, Rivera needed to make immediate decisions on how to proceed based on her impressions of the answers provided during Daughter and Younger Son's forensic interviews. See e.g. 55 PA. CODE § 3490.55. It cannot be seriously disputed in this case that judicial proceedings were not foreseeable, in some shape or form, in some division of the Monroe County Court of Common Pleas.

As stated in B.S., "absolute immunity protects not only caseworkers' presentations of their recommendations to a court, but also their 'gathering and evaluation of information' to formulate those recommendations and to prepare for judicial proceedings." 704 F.3d at 269 (quoting Ernst, 108 F.3d at 498). "The key to the absolute immunity determination is…the underlying function that the investigation serves and the role the caseworker occupies in carrying it out." Id. (citing Schneyder, 653 F.3d at 332). At some point during and after Daughter and Younger Son's interviews, Rivera had to reach conclusions, develop recommendations in her mind about placement and custody, and prepare for potential judicial proceedings. Since child welfare workers are afforded absolute immunity for the formulation of recommendations to the court, which she did in this case, Rivera has absolute immunity for this portion of her conduct. B.S., 704 F.3d at 270.

### b. Calling a Court of Common Pleas Judge

It is undisputed that Doe refused to voluntarily relinquish custody of Younger Son and Daughter to Husband after the CAC interviews. Doe admits that, at some point thereafter, Rivera called Judge Higgins. (See Doc. 81, Pl. Resp. to Def. SOF, ¶¶ 32–33 (admitting "Judge Higgins told Rivera to have [Husband] to have his attorney promptly file a petition to modify the existing custody order[.]").[15]

Communicating with a judicial officer would cloak Rivera in absolute immunity if such conduct could be characterized as presenting recommendations to the court. Ernst, 108 F.3d at 495; B.S., 704 F.3d at 265. As Rivera tells her side of the story, she presented recommendations to the judge:

> Q. And were you in fact presenting to the judge – calling to present to the judge a situation in which you believed that the children needed to be removed from their mother's custody?
>
> A. Not to be removed from her custody. I explained that this was her time of custody, and that **we have a fit and willing parent who's able to mitigate the safety concern we had**, but that she was not allowing for the children to go with their father because it wasn't his time to have custody.

---

[15] Regarding the substance or details of the conversation between Judge Higgins and Rivera, there are no genuine issues of material fact which would preclude granting Rivera absolute immunity as a matter of law. It is undisputed that Rivera called Judge Higgins. Doe also does not dispute that Judge Higgins told Rivera to relay to Husband about filing a petition to modify custody. It is undisputed that Husband went home with Daughter and Younger Son instead of Doe after that phone call to the judge. Resolving disputed facts about all the other details of the call would not change the immunity analysis in this memorandum.

> When I explained to him, **the only other option would have been foster care; and his response to me was they can go with their father and for [Husband] to file a custody modification with – the following day with his attorney, if he had one.**

(Doc. 71, Def. Ex C., C. Rivera Dep., Vol I, 29:2-17) (emphasis added).

Furthermore, defendants have admitted that it is Monroe County CYS's practice "that if there is a willing and able parent who can take custody of a child, but there is a custody order that disqualified that parent from taking custody, the agency is to contact the court for approval to override that custody order." (Pl. SOF. ¶ 52) (emphasis removed).  Therefore, Defendant Rivera was functioning in an advocate's role during the phone call.

Doe takes the position that Defendant Rivera was not acting in a prosecutorial manner because there were no dependency proceedings pending and none ever occurred.  She argues, "the agency's policy of 'shifting' custody seems to have been designed precisely to avoid dependency proceedings, making its argument here for absolute immunity, ironic." (Doc. 77, Pl. Br. in Opp. Def. MSJ at 12).  In essence, Doe asserts that Rivera should not be granted absolute immunity because she advocated for dependency court avoidance in formulating and presenting recommendations to the court.  This argument is "not

27

without logical force" but is an "overstated" contention.[16] <u>B.S.</u>, 704 F.3d at 264.

In <u>B.S.</u>, the Third Circuit explicitly found absolute immunity in similar

circumstances, holding that the absence of dependency proceedings is not a

basis for resolving the issue of immunity. 704 F.3d at 256–57, 265–66.

Another case relied upon by Doe in opposing absolute immunity, <u>D.M. v.</u>

<u>Cnty. of Berks</u>, 929 F. Supp. 2d 390 (E.D. Pa. 2013), is actually persuasive to the

defendants' position. Specifically, in <u>D.M.</u>, the court denied two CYS solicitors

and a casework supervisor the protections of absolute immunity in a ruling on

their motion to dismiss. <u>Id.</u> at 401–02. The denial of absolute immunity was

premised upon allegations in the complaint that only demonstrated "non-hurried"

judgments by those CYS defendants. <u>Id.</u> This matter is factually distinguishable

and undisputedly involved immediate judgment calls involving child safety and

placement.

---

[16] To elaborate, the <u>B.S.</u> court understood the policy implications of providing CYS caseworkers with absolute immunity for causing informal custody switches in their assessments and evaluations of suspected child abuse. 704 F.3d at 264–65. Thirteen years later, the court understands Doe's other arguments on the issue. (<u>See</u> Doc. 81 at 11–12). Absolute immunity could create accountability issues with county child welfare workers. Specifically, any caseworker could claim immunity by asserting that they had concluded their child abuse assessment and were pursuing a protective remedy when shifting custody from one parent to the other in an informal process with a willing judge. The court is also cognizant of the impact of granting absolute immunity to CYS caseworkers and supervisors who reallocate the burden of addressing child safety concerns from state-involved dependency court to private-party custody court. On the other hand, the lack of absolute immunity would disincentivize CYS caseworkers from taking fast, practical action to keep vulnerable children with a parent rather than in placement in non-kinship foster care. Without immunity, CYS caseworkers would be incentivized to take the most aggressive and disruptive action possible. After considering Doe's policy arguments, those arguments are not persuasive.

Consequently, after careful consideration of the undisputed facts regarding Defendant Rivera's conduct and functions on June 30, 2021 with respect to Doe, Daughter, and Younger Son, she enjoys absolute immunity under Ernst and B.S. Judgment will be entered in Rivera's favor on the Section 1983 claim asserted against her. The court need not reach her alternative argument that she is entitled to qualified immunity.

**2. Whether Monroe County Violated Doe's Procedural Due Process Rights Through a Policy or Custom**

Municipalities and local governing bodies do not enjoy immunity from suit under Section 1983, whether qualified or absolute. See Owen v. City of Independence, 445 U.S. 622, 638 (1980). Thus, the court turns to Doe's procedural due process claim against Monroe County. Both sides believe there are no genuine issues of material fact and request judgment as a matter of law. Only Doe comes out ahead on that argument. The undisputed facts in this case demonstrate a due process violation caused by county policy or custom. Partial summary judgment will be granted in favor of Doe and against Monroe County on the issue of the county's Section 1983 liability.

Section 1983 provides plaintiffs with a cause of action against any person who, acting under color of state law, deprives another of rights secured by the Constitution or the laws of the United States of America. See Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996) (discussing 42 U.S.C. § 1983). In this case,

the parties do not dispute that Monroe County and its employees acted under the color of state law.  Thus, to prevail on her Section 1983 claim, Doe must also establish the violation of her federal constitutional or statutory rights and demonstrate that the violation caused her complained-of injury.  See Elmore v. Cleary, 399 F.3d 279, 281 (3d Cir. 2005) (citing Sameric Corp. of Del., Inc. v. City of Phila., 142 F.3d 582, 590 (3d Cir. 1998)).

The relevant portion of the Fourteenth Amendment, the Due Process Clause, provides: "nor shall any State deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend XIV, § 1.  The Due Process Clause has a substantive and procedural component.  Mammaro v. New Jersey Div. of Child Prot. & Permanency, 814 F.3d 164, 169 (3d Cir. 2016), as amended (Mar. 21, 2016).  Doe raises a procedural due process claim only.[17] The procedural component of the Due Process Clause requires the state "to afford an adequate level of process (notice and an opportunity to be heard) before depriving persons of a protected interest." Id.

A procedural due process claim consists of three elements: (1) a deprivation of life, liberty, or property; (2) by a state actor; (3) without due

---

[17] The county also argues for summary judgment on any substantive due process claim raised by Doe.  Doe never asserted a substantive due process claim in this action.  Thus, this memorandum will not address Doe's substantive due process rights.

process of law.  Parker v. New Jersey Motor Vehicle Comm'n, 158 F.4th 470, 481 (3d Cir. 2025) (citations omitted).

The first step in the analysis is identifying whether the asserted individual interest is encompassed within the Fourteenth Amendment's protection of life, liberty, and property. Elmore v. Cleary, 399 F.3d 279, 282 (3d Cir. 2005) (cleaned up).  It is well established that parents have a constitutionally protected liberty interest in the care, custody, and control of their children. Troxel v. Granville, 530 U.S. 57, 66 (2000) (citations omitted) (discussing the fundamental right of parents to make decisions in these areas);  Croft v. Westmoreland Cnty. Child. & Youth Servs., 103 F.3d 1123, 1125 (3d Cir. 1997) (citations omitted) (referring to parents' liberty interest as "the custody, care and management of their children"). A parent's fundamental interest in the care and custody of their children "does not evaporate simply because they have not been model parents[.]" Santosky v. Kramer, 455 U.S. 745, 753 (1982).  As observed, these are "near-absolutist pronouncements" of parental rights. Gruenke v. Seip, 225 F.3d 290, 304 (3d Cir. 2000)

"The Due Process Clause of the Fourteenth Amendment prohibits the government from interfering in familial relationships unless the government adheres to the requirements of procedural…due process." Croft, 103 F.3d at 1125.  Procedural due process includes the right to notice and the opportunity to

be heard at a meaningful time and a meaningful manner. <u>Fuentes v. Shevin</u>, 407 U.S. 67, 80 (1972); <u>see also</u> <u>LaChance v. Erickson</u>, 522 U.S. 262, 266 (1998) (citing <u>Cleveland Bd. of Ed. v. Loudermill</u>, 470 U.S. 532, 542 (1985)).

"While the question of what constitutes due process is necessarily rooted in the circumstances of a given case, it is axiomatic that at least some process is required when a 'state seeks to alter…or suspend a parent's right to the custody of [her] minor children.' " <u>B.S.</u>, 704 F.3d at 271 (quoting <u>McCurdy v. Dodd</u>, 352 F.3d 820, 827 (3d Cir. 2003).  The extent of the government's obligation is flexible, with a factor-based balancing test.[18] <u>Id.</u> (citing <u>Mathews v. Eldridge</u>, 424 U.S. 319, 333 (1976)).

The Third Circuit has previously balanced those factors.  As explained:

> The deprivation of a parent's custodial relationship with a child is among the most drastic actions that a state can take against an individual's liberty interest, with profound ramifications for the integrity of the family unit and for each member of it. From the parent's perspective, there may be little meaningful difference between instances in which the state removes a child and takes her into state custody and those in which the state shifts custody from one parent to another, as occurred here. In either case, the government has implicated a fundamental liberty interest of the parent who loses custody. The state has caused a deprivation and risks having done so wrongly. Therefore, assuming the

---

[18] Those factors are: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3), the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.  <u>Mathews</u>, 424 U.S. at 335.

32

> fiscal and administrative burdens of affording such parents
> a prompt post-removal hearing do not outweigh the need
> for one—and it is hard to imagine when they would—such
> a hearing ought to be held.

Id. at 272 (cleaned up).

This case is not much different than B.S. v. Somerset County. In that matter, the county did not provide the mother with a prompt and fair post-deprivation hearing after custody was transferred to the child's father and the transfer occurred pursuant to a county custom, referred to as a summary-and-order procedure in that case. 704 F.3d at 272–73, 275. To the extent that the case differs— written orders in B.S. and a verbal order here—Doe received less procedural protections than the mother in B.S. No written order was issued as the result of the phone call to Judge Higgins. Doe had nothing to challenge or appeal. No hearing was set. Such conduct violated Doe's due process rights.

As for Monroe County arguments against that outcome, despite "concur[ring] with the plaintiff's hornbook explanation of due process standards in cases of state interference with familial relationships[,]" (Doc. 77 at 6), the county appears to assert that: 1) Judge Higgins is responsible for any due process violation; 2) that Doe's procedural due process rights were protected within the custody action; and 3) that B.S. is different because that case involved custody under CPS laws. All these arguments were addressed in some respect in B.S. and still fall short more than a decade later.

The arguments implicating Judge Higgins are not persuasive. Rivera sought judicial authorization to avoid CYS taking protective custody of two children. Rivera is as responsible for ensuring Doe's procedural due process rights as anyone and Rivera's conduct gave Doe less procedural protections than if CYS took custody of Daughter and Younger Son.[19] Moreover, the ability of a parent to file a petition under a child custody statute does not satisfy the state's burden of providing an opportunity to be heard in a meaningful time and a meaningful manner. See B.S., 704 F.3d at 272 (citing Mathews, 424 U.S. at 333). As discussed in B.S., a county was required to provide a prompt hearing "[i]n view of the extremely important liberty interests at stake," after it removed custody from one parent suspected of child abuse and shifted it to the other parent, "regardless of whether or not state law independently imposed that obligation." Id. at 273. "[B]eing heard much later, after the deprivation, fail[ed] to address the harm." Id. at 272. Thus, under the Constitution, Doe was owed a hearing on the verbal order in one form or another. She never received one on that specific order.

Based on the undisputed facts, a hearing, if any, occurred pursuant to custody petitions filed by Husband on July 2, 2021. (See Doc. 74-6). While the

---

[19] See 23 PA. CONS. STAT. § 6315(d) (referencing 42 PA. CONS. STAT. § 6332); (requiring an informal hearing within 72 hours with notice to parents in cases where the child is placed in shelter care or is in protective custody).

34

order from those petitions eventually confirmed the status quo of Doe and Husband's custodial rights as of July 7, 2021, that order still only addressed Husband having emergency temporary physical custody; it was not the result of a hearing.[20] (See Doc. 74-7). The July 7, 2021 order also only set the matter for a conciliation conference before a master in custody three weeks later, not a plenary hearing or even an abbreviated, summary, *pendente lite* hearing with a judge.[21] The court has no record of any hearing on Husband's emergency petition ever actually occurring.

The Third Circuit's disposition in B.S. resulted in summary judgment being awarded in favor of the mother on her procedural due process claim against the county with a trial on damages and the denial of the defendants' motion as to that claim. 704 F.3d at 259, 274, 276. Before similarly entering the order granting Doe's motion for partial summary judgment, there is one more matter to address.

A municipality may be held liable under Section 1983 only where the municipality itself causes the constitutional violation through execution of a governmental policy or custom, not on a respondeat superior theory. Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 691, 694 (1978). As

---

[20] See 23 PA. CONS. STAT. § 5323(b); PA. R. CIV. P. 1915.13 (concerning special or interim relief under the Child Custody Act).

[21] The Pennsylvania Rules of Civil Procedure refer to this event as an "office conference." PA R. CIV. P. 1915.4-2.

indicated above, Monroe County has admitted to a custom of its CYS workers contacting the court for approval to override a custody order without the impacted parent being present on the phone call.  It is undisputed that this custom was used in Doe's case.  Based on the fundamental nature of Doe's right to care and custody of Daughter and Younger Son, she sustained an injury when custody was informally switched to Husband as the result of the CAC interviews.  Thus, Monroe County is liable under Section 1983 for "whatever damages a jury may deem appropriate to redress that violation." B.S., 704 F.3d at 275 (citation omitted).

**Conclusion**

For the reasons set forth above, Defendant Crystal Rivera is entitled to absolute quasi-judicial immunity for her functions and conduct as a Monroe County CYS supervisor on June 30, 2021.  Defendants' motion for summary judgment will thus be granted in part as to Defendant Rivera's immunity but otherwise denied.  Rivera will be dismissed from this action.

However, the policies or customs of Monroe County to avoid dependency proceedings violated Doe's right to procedural due process.  Consequently, plaintiff's motion for partial summary judgment will be granted against the county as to its Section 1983 liability.  An appropriate order follows.

Date: 2/13/26

_____
**JUDGE JULIA K. MUNLEY**
**United States District Court**